IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA, CHARLESTON DIVISION

| | | |
|---|---|---|
| CRAIG THOMAS, | ) | |
| | ) | Case No. 2:26-cv-03104-DCN |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | **JURY TRIAL DEMANDED** |
| LINEAJE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Craig Thomas ("**Thomas**" or "**Plaintiff**") files this Complaint against Defendant Lineaje, Inc. ("**Lineaje**" or "**Defendant**"), concerning its acts, omissions, and status upon knowledge, and all other matters upon information, belief, and investigation, and respectfully shows the Court as follows:

## I. THE PARTIES

1.      Plaintiff Thomas is an adult citizen residing in Charleston, South Carolina, who was hired by Lineaje as a remote worker while living in Charleston, South Carolina, and who worked for Lineaje exclusively from his home in Charleston, South Carolina.

2.      Defendant Lineaje, Inc., is a Delaware corporation with its principal place of business located at 4699 Old Ironsides Dr. #450, Santa Clara, California.

## II. JURISDICTION, VENUE, AND GOVERNING LAW

3.      This Court has diversity jurisdiction of this action under 28 U.S.C. § 1332 because the parties are completely diverse (Thomas is a citizen of South Carolina whereas Lineaje is a citizen of Delaware and California) and the amount in controversy exceeds $75,000, including a

PLAINTIFF'S COMPLAINT                                                                PAGE 1 OF 14

principal amount of $160,200 in actual damages plus claims for statutory damages and attorneys' fees.

4.    This Court also has jurisdiction under 28 U.S.C. § 1367 with respect to Plaintiff's South Carolina state law claims, including for failure to pay commissions under South Carolina Code § 41-10-10 *et seq.*, breach of contract, and negligent misrepresentation, because they are so related to the federal claims within the Court's original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

5.    Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events and omissions giving rise to Craig's claims occurred within this District, where he lived and worked from home at all material times.

6.    South Carolina law governs this dispute. While Lineaje may claim it contractually required Thomas to agree that this dispute would be decided under Delaware law, any such purported requirement is void *ab initio* under South Carolina Code § 41-10-100 as it would have the effect of contravening the provisions of Title 41, Chapter 10 of the South Carolina Code.

### III. BACKGROUND FACTS

7.    Lineaje hired Thomas as Director of Sales, Federal, pursuant to an offer letter dated November 23, 2024, that Thomas signed at or about the time he was hired (the "**Offer Letter**").

8.    The Offer Letter confirms that Thomas is eligible for commissions.

9.    On or about May 12, 2025, Thomas signed Lineaje's "Compensation Plan for Craig Thomas," which had an Effective Date of January 1, 2025 (the "**Comp Plan**").

10.    The Comp Plan provided a $175,000 base salary plus variable compensation "designed to reward you for achieving and exceeding your quota," namely:

1. Quota and Incentive
   - 2025 Quota: $1,950,000 Annual Contract Value (ACV).
   - Q1 Quota:   $250,000
   - Q2 Quota:   $600,000
   - Q3 Quota:   $700,000
   - Q4 Quota:   $400,000

| Quota Attainment | Commission Rate | Note |
|---|---|---|
| >0%-100% | 8.9% of ACV | |
| 100% + | 11.2% of ACV | Unrestricted. The accelerator applies only to the portion of ACV achievement >100% |
| Renewals | 8.9% of ACV | No Quota Relief |

11.    The Comp Plan further provided:

| SPIFF | Amount | Note |
|---|---|---|
| Multi-year deals collected upfront | 8.9% of ACV for years 2 and beyond | Unrestricted |

2. Accelerators

The accelerator in the plan ensures significant upside for exceeding your targets, allowing for unlimited earning potential.

12.    The Comp Plan further provided:

### 3. Terminations

In the event of the termination of employment for any reason, you are eligible to receive only bonuses/commissions/SPIFFs that have been earned up through the last full month of employment. The Company may withhold such payments until the customer invoice is paid or other milestone is achieved if circumstances warrant such consideration. NO COMMISSIONS MAY BE EARNED AFTER TERMINATION OF EMPLOYMENT. To clarify, upon termination, the commission on ALL the payments that have not yet been invoiced to the customer, has not yet been earned and would not need to be payable after termination. Termination for any reason shall not relieve the Participant of the obligation to repay the Company for any recoverable draws, commissions, bonus or other sums advanced by the Company. The Company reserves the right to offset these amounts due to the Company against any salary, vacation pay, bonus, SPIFF, commission or other remuneration due at the time of termination to the extent permitted by law. This right may be exercised after your termination from this Plan.

13.      The Comp Plan further provided:

### Terms

- This compensation plan is effective as of **January 1, 2025** and will be reviewed annually.
- All payouts are contingent on meeting the stated ACV goals and are subject to company policies.
- 50% of the commissions will be paid at the end of the following month upon receipt of the signed Order Form or Purchase Order number, and 50% at the end of the following month in which the invoicing for such orders are sent.
- SPIFF will be paid at the end of the following month in which the invoices for such orders are collected.
- No commissions on deals for which the complete tracking is not available in HubSpot for the full lifecycle of the deal

14.      The Comp Plan further provided:

- Quota is based on subscription or consumption ACV only and attainment % is calculated as total ACV divided by the annual quota
- Marketplace deals do not count towards quota retirement, unless sales had identified these in HubSpot.
- Marketplace deals converted to Direct contracts or "Private" Marketplace deals count towards quota retirement. "Private" deals follow the Cloud Service Providers' definition of Private Deals in their marketplaces.
- Deals reversed within six months of PO will be reversed against quota and all payments (Quota commission, SPIFFs) clawed back
- The management reserves the right to revisit Quotas and commissions every 6 months
- Corporate accounts, as defined by the management, will not retire the quota. However, based on direct sales effort in closing the deal, the management may approve a bonus.
- Windfall - "Windfall" is a sale (or part of a sale) that is created by, or expanded by, fortuitous or unusual conditions beyond the control of the sales representative, or events or circumstances unrelated to the sales representative's efforts. The Company in its discretion may determine that calculation of quota credit and commissions, bonus or other incentive pay based on the windfall would result in unexpected unfairness. Items defined by Company as a windfall or requiring an adjustment may be partially or totally included or excluded in the computation of quota credit and incentive payments and commissions at the discretion of Company.

15.    None of the exclusions expressly stated under the Comp Plan, nor otherwise ever announced to Thomas, excluded Small Business Innovation Research ("**SBIR**") award contracts from Lineaje's obligation to pay commissions to Thomas.

16.    In or about May 2025, the United States Air Force signed a lucrative SBIR contract with Lineaje that would generate $1.8 Million of revenue for Lineaje as a direct result of Thomas's efforts (the "**Contract**").

17.    On or about May 1, 2025, prior to the Contract being executed, Lineaje's CFO told Thomas: "The entire deal does not automatically retire quota and become eligible for full payout. It would be eligible for a payout determined and agreed between the manager and the company."

18.    Lineaje's CFO also initially told Thomas on or about May 1, 2025, that he should discuss the commission with his manager (Lineaje's SVP and CISO), but then the CFO said not to do so as the CFO would.

19.     Thomas reasonably understood the CFO's statement as confirmation he would be paid a commission on the Contract.

20.     That understanding was later confirmed by Lineaje adopting and having Thomas sign the Comp Plan on or about May 12, 2025, covering the Contract, after the details of the Comp Plan had been under discussion for months before it was formally adopted and signed by Thomas.

21.     The CFO's comments related to the fact that the $1.8 Million Contract value nearly met Thomas's full $1.95 Million annual quota, including meeting his quarterly quotas for the first three quarters of the year and all but $150,000 of his quota for the fourth quarter.

22.     Per the terms of the Comp Plan, Thomas earned a commission of $160,200 on the Contract, calculated as 8.9% of the value $1.8 Million value of the Contract, with 50% of Thomas's commission, or $80,100, being earned in June 2025, and the second 50%, another $80,100, being earned after Contract milestones were reached in July 2025.

23.     After the commissions had been earned, Thomas gave his 2-week notice of intent to resign from Lineaje on or about July 17, 2025, with a termination date of July 31, 2025.

24.     After conducting Thomas' final exit interview on his last day, Lineaje's CFO suddenly reversed course on the commission on the Contract, telling Thomas for the first time ever that Lineaje was not paying any of the $160,200 of commissions due to Thomas.

25.     Lineaje's refusal was based entirely on a position that is directly contradicted by Lineaje's own written Comp Plan.

26.     Specifically, Lineaje claimed: "We have reviewed your email and wanted to let you know once again that SBIR is not a sales deal, but only an innovation funding award from Department of the Air Force, and hence, does not qualify for any sales commissions."

27.    The self-serving "once again" comment was a fabrication – never before then had Lineaje taken this position.

28.    On the contrary, Lineaje had previously said it would pay the commission, both before formally adopting the Comp Plan and again by adopting and having Thomas sign the Comp Plan that by its own terms covers the Contract unless excluded, which it was not.

29.    Indeed, the Comp Plan did not exclude SBIRs or "innovation funding awards," despite enumerating other exclusions, and Lineaje had  never otherwise excluded SBIRs.

30.    Simply put, Lineaje invented a purported new exclusion after Thomas had resigned solely to avoid paying Thomas the commissions he had earned pre-termination.

31.    Because of its failure and refusal to pay, Lineaje forced Thomas to retain counsel.

32.    Thomas's initial lawyer sent an evidence preservation letter and a payment demand on or about August 5, 2025, including giving specific notice of Thomas's claims under South law.

33.    Lineaje continued to fail and refused to pay the commissions.

34.    After retaining the undersigned litigation counsel, Thomas gave Lineaje one final chance to pay, but it still continued to fail and refuse, forcing Thomas to file this suit.

35.    All conditions precedent to this suit have been performed or occurred.

## IV. CAUSES OF ACTION

### FOR A FIRST CAUSE OF ACTION
### VIOLATION OF SOUTH CAROLINA CODE TITLE 41, CHAPTER 10.

35.    Thomas incorporates all prior allegations, where not inconsistent, as if fully set forth herein.

36.    Title 41, Chapter 10 of the South Carolina Code imposes various requirements on an "employer," defined in South Carolina Code § 41-10-10 to include every corporation employing any person in South Carolina.

37.     Lineaje is an "employer" as defined in the statute because it employed Thomas in South Carolina.

38.     South Carolina Code § 41-10-10 defines "wages" to mean "all amounts at which labor rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or other method of calculating the amount."

39.     Lineaje owed "wages" to Thomas, including the $160,200 of commissions described hereinabove.

40.     South Carolina Code § 41-10-20 provides that Title 41, Chapter 10, applies to every employer in South Carolina except employers employing fewer than five employees at all times during the preceding twelve months.

41.     Lineaje employed five or more employees at times during the preceding twelve months.

42.     South Carolina Code § 41-10-30 provides that, "Every employer shall notify each employee in writing at the time of hiring of the normal hours and wages agreed upon, the time and place of payment, and the deductions which will be made from the wages, including payments to insurance programs," and that, "Any changes in these terms must be made in writing at least seven calendar days before they become effective."

43.     Lineaje provided Thomas in writing at the time of hire with the wages agreed upon and time and place of payment as set forth in Thomas's Offer Letter, and later in the Comp Plan executed to be effective as of the time of hire.

44.     After conducting Thomas's final exit interview at the end of his last day of employment on July 31, 2025, and thus effectively after termination of his employment, Lineaje

first told Thomas it no longer believed the commissions were owed despite having previously acknowledged they were.

45.     Lineaje never made any changes in writing to the compensation terms in the Offer Letter or Comp Plan prior to July 31, 2025, including without limitation not making any change in writing seven calendar days before July 31, 2025, that would obviate Lineaje's obligation to pay Thomas the $160,200 of commissions earned.

46.     South Carolina Code § 41-10-40 provides that wages must be paid in cash or by negotiable instrument of "even date with the payday," may be paid by direct deposit upon complying with certain additional obligations, may not be withheld or diverted absent certain narrow exceptions, and must be paid at the time and place designated by written notice as required by South Carolina Code § 41-10-30(A).

47.     Lineaje failed to pay Thomas' commissions owed at the time designated in his Offer Letter and Comp Plan by failing to pay by July the $80,200 of commissions earned in June and by failing to pay the $80,200 of commissions earned in July.

48.     South Carolina Code § 41-10-50 provides, "When an employer separates an employee from the payroll for any reason, the employer shall pay all wages due to the employee within forty-eight hours of the time of separation or the next regular payday which may not exceed thirty days."

49.     When Lineaje separated Thomas from payroll because it accepted his resignation, Lineaje failed to pay Thomas the $160,200 of commissions due to Thomas within forty-eight hours of the time of separation or on the next regular payday within thirty days.

50.     South Carolina Code § 41-10-80(C) provides: "In case of any failure to pay wages due to an employee as required by Section 41-10-40 or 41-10-50 the employee may recover in a

civil action an amount equal to three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees as the court may allow. Any civil action for the recovery of wages must be commenced within three years after the wages become due.

51. Lineaje failed to pay Thomas $160,200 of "wages" as required by Sections 41-10-40 or 41-10-50, making Lineaje liable to Thomas under Section 41-10-80(C) for treble damages of $480,600, plus attorney fees.

52. Thomas timely brings this claim less than three years after the wages became due.

53. Thomas incurred and paid $2,345 with his initial legal counsel seeking to secure payment of the commissions without litigation.

54. Thomas has now also incurred in excess of $10,000 of attorneys' fees in preparation of this Complaint, and final pre-suit resolution efforts that proved unfruitful.

55. Thomas has incurred costs for filing this lawsuit.

56. Thomas' reasonable attorneys' fees and costs continue to mount in this litigation.

57. Thomas' recoverable total on this claim thus already exceeds $492,945.

58. Thomas is also entitled to judgment interest.

59. Thomas seeks all relief to which he is legally entitled on this claim.

## FOR A SECOND CAUSE OF ACTION
## BREACH OF CONTRACT

60. Thomas incorporates all prior allegations, where not inconsistent, as if fully set forth herein.

61. This cause of action is plead in the alternative to the extent necessary.

62. Thomas had a valid and binding contract of employment with Lineaje, the terms of which included the Comp Plan.

63.    Thomas performed his obligations under the contract, including procuring the lucrative Contract to generate $1.8 Million of revenue for Lineaje.

64.    Lineaje breached the contract with Thomas by failing to pay commissions on the Contract due to him per the Comp Plan.

65.    Lineaje's breach caused Thomas to suffer damages, including without limitation the unpaid commissions.

66.    As a result of Lineaje's breach, Thomas has been deprived of the commissions.

67.    Thomas has been forced to retain counsel as a result of Lineaje's breach of contract.

68.    Thomas is legally entitled to and seeks recovery against Lineaje for actual  and consequential damages including owed commissions, pre- and post- judgment interest, attorneys' fees, and costs.

## FOR A THIRD CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

69.    Thomas incorporates all prior allegations, where not inconsistent, as if fully set forth herein.

70.    This cause of action is plead in the alternative to the extent necessary.

71.    Lineaje made a false statement or representation to Thomas, namely, that Thomas had earned, and it would pay commissions on the Contract to Thomas per the Comp Plan.

72.    This false statement was made on or about May 1, 2025, as well as previously with respect to commissions on SBIRs generally and later with respect to the Contract again.

73.    Lineaje had a pecuniary interest in making the statement, including to induce Thomas to continue working as an employee for Lineaje.

74.    Lineaje owed Thomas a duty of care to provide truthful information.

75.     Lineaje breached that duty by telling Thomas he had earned and would be paid commissions on the Contract when Lineaje had no intent to do so if he later resigned.

76.     Thomas justifiably relied on Lineaje's representations, including changing jobs and voluntarily resigning from Lineaje based upon the representations.

77.     Thomas suffered a pecuniary loss – nonpayment of the commissions – as a direct and proximate result of his reliance on Lineaje's false representations.

78.     Thomas is thus legally entitled to and seeks recovery against Lineaje for actual and consequential damages including owed commissions, pre- and post- judgment interest, attorneys' fees, and costs.

## FOR A FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT

79.     Thomas incorporates all prior allegations, where not inconsistent, as if fully set forth herein.

80.     This cause of action is plead in the alternative to the extent necessary.

81.     Thomas performed work for Lineaje, including securing the Contract.

82.     Lineaje accepted, used, and enjoyed the benefits of Thomas's work.

83.     Lineaje knew or should have known that Thomas expected compensation in the form of commissions on the Contract, including without limitation because Lineaje had promised to pay such commissions to Thomas.

84.     It would be unjust for Lineaje to retain the benefit without paying for it.

85.     Thomas is thus legally entitled to and seeks recovery against Lineaje of the commissions, pre- and post-judgment interest, and costs.

## FOR A FIFTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL

86.     Thomas incorporates all prior allegation, where not inconsistent, as if fully set forth herein.

87.     This cause of action is plead in the alternative to the extent necessary.

88.     At various times, Lineaje made specific, unambiguous promises to pay Thomas commissions on the Contract.

89.     Lineaje intended and reasonably expected that Thomas would rely on the promise to pay Thomas commissions on the Contract.

90.     Thomas relied on the promise in a manner by making financial and personal decisions that were reasonable under the circumstances, resulting in a substantial detriment, loss, and disadvantage including, without limitation, loss of the $160,200 of commissions.

91.     Thomas' reliance was reasonable based on Lineaje's conduct and representations.

92.     Lineaje intended that Thomas rely of its promise of commissions.

93.     Lineaje's failure to honor its promise to Thomas was without substantial justification.

94.     The only way to avoid an unjust outcome is to enforce Lineaje's promise.

95.     Thomas seeks actual and consequential damages, pre- and post-judgment interest and costs for Lineaje's wrongful actions.

## V. JURY DEMAND

96.     Plaintiff hereby demands a trial by jury in the above-captioned matter.

## VI. PRAYER

For the foregoing reasons, Plaintiff prays for entry of judgment against Defendant for all relief and damages as stated above, including the commissions, punitive damages of three times

the commissions, attorneys' fees, costs of court, pre- and post-judgment interest, and such other relief, both general and special, at law and in equity, to which Plaintiff may be justly entitled.

Respectfully Submitted,

**BLOODGOOD & SANDERS, LLC**
*s/Nancy Bloodgood*
Nancy Bloodgood, Fed. Bar No.: 5208
242 Mathis Ferry Road, Suite 201
Mt. Pleasant, SC 29464
Telephone: (843) 972-0313
Email: nbloodgood@bloodgoodsanders.com

**Attorneys for Plaintiff**

Mt. Pleasant, South Carolina

Date: July 30, 2026